UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **AARON BURRISON, individually, and on behalf of all others similarly situated,** | Case No. 1:25-cv-10885 |
| **Plaintiff,** | **CLASS ACTION** |
| | **DEMAND FOR JURY TRIAL** |
| **v.** | |
| **FLOATME, CORP.,** | |
| **Defendant.** | |

**CLASS ACTION COMPLAINT**

Plaintiff Aaron Burrison, a Petty Officer in the U.S. Coast Guard ("Plaintiff" or "PO Burrison"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against FloatMe, Corp. ("FMC" or "Defendant"), and alleges as follows:

**NATURE OF THIS ACTION**

1.      This Complaint seeks to protect active-duty military service members from FMC's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, FMC makes no effort to fulfill its duty to

determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2.      FMC is in the business of payday lending through an earned wage access ("EWA") product — it makes funds available to its customers, who repay FMC principal and finance charges (including expedite fees and subscription charges) on or just after payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "no interest" and promising no mandatory fees, in practice, FMC regularly takes in **triple- and quadruple-digit** finance charges for the loans it issues. FMC levies its customers with finance charges high enough to make payday lenders blush, with a recent study revealing FMC's loans charge **956% APR** on average. Some of FMC's loans to Plaintiff were even more expensive, with APRs exceeding **1,270%**. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3.      Plaintiff, a Petty Officer in the U.S. Coast Guard, has used FMC's cash advance product for years. By virtue of the sky-high fees charged for early access to his salary, FMC has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4.      Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating

revenue for predatory lenders. Considering the substance of the transactions, Defendant's cash advance transactions are in reality consumer credit.

5.     In violation of the MLA, Defendant uses its cash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.     FMC's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(2), (3), (5).

7.     FMC systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.     Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.

concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

9.      FMC's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. PO Burrison seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## PARTIES

10.     Plaintiff is an individual, over 18 years of age. At all times relevant, PO Burrison was a natural person and resident of Suffolk County, Massachusetts. PO Burrison has been an active-duty service member in the United States Coast Guard since March 2017.

11.     Defendant FloatMe, Corp., is a Texas corporation with its principal place of business in San Antonio, Texas. FMC has offered and entered into loan agreements with consumers, including Covered Members, since at least 2020, entering into millions of credit transactions.

## TOLLING OF THE STATUTE OF LIMITATIONS

12.     The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*,

---

[3] *Id.* at 10–11.
[4] *Id.* at 11.

tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to PO Burrison, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## JURISDICTION AND VENUE

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 101, 1391, and 10 U.S.C. § 987(f)(5)(E) because Defendant FMC coordinated business operations and committed the wrongful acts alleged herein in Massachusetts and in Suffolk County.

14.     This Court has jurisdiction over FMC, because it, at all times relevant herein, was qualified to do business and regularly conducted business in Massachusetts.

15.     During the relevant period, Defendant FMC extended thousands of usurious loans to Covered Members (and many thousands more to non-military customers) in Massachusetts and in Suffolk County—crediting and debiting bank accounts at Massachusetts banks belonging to Massachusetts consumers with loan proceeds and payoffs for FMC users. In addition, FMC directed advertisements to consumers in Massachusetts. In so doing, FMC purposefully availed itself of the privileges and benefits of conducting its business within the commonwealth of Massachusetts.

## LEGAL BACKGROUND

16.     The MLA Was Designed to Curb Predatory Payday Loans to Covered

Members.

17.     The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

18.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

19.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In

_____

[5] Report, *supra* n.1.

[6] *Id.* at 10–11.

[7] *Id.* at 11.

[8] *Id.* at 14. To be sure, EWA providers like FMC do not collect physical checks from their customers at loan initiation but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[9] Those loans, like FMC's, "are delivered and collected online through electronic fund transfer."[10]

20.     The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate FMC's business model:

(1)     Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2)     Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3)     … Increasingly the Internet is used to promote loans to Service members.

(4)     Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

…

(6)     Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

_____

[9] *Id.* at 15.

[10] *Id.* at 16.

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrower to consider loan payments as being their top priority." *Id.* at 44.

[12] *Id.* at 21–22.

21.     The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

22.     Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

23.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

24.     The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb

---

[13] *Id.* at 39.

[14] *Id.* at 41–42.

[15] *Id.* at 46.

[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

25.    Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

**The Military Lending Act**

26.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

27.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

28.    The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

29.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to

---

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

30.     The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

31.     The MLA also prohibits creditors from using a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987.

**The Truth in Lending Act**

32.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

33.     Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those FMC offers here. FMC fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

## FACTS

**The Earned Wage Product Market and FMC**

**EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

34.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

35.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

36.     EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

37.     Defendant FMC is one such fintech company that provides an EWA advance service, which it calls "Floats." FMC markets its Floats as "Fast cash when you need it," allowing eligible members to "borrow up to $50 between paydays." FMC has characterized its cash advances as "free money" with "no hidden fees" and "no interest."

38.     To repay these loans, users must link their bank account to their FMC profile and authorize automated debits from their linked external bank account on the scheduled repayment date.

39.     EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

40.     FMC, like its EWA provider competitors, is generally paid through two types of fees: (1) expedite fees, and (2) mandatory subscription fees.

41.     First, **expedite fees** (referred to by FMC as fees for "Instant Floats") are charged to provide instant access to loan funds. For Floats, FMC charges between $1.00 and $5.00 for access to Instant Floats:

| Float Amount | Instant Float Fee |
|---|---|
| $10 | $1.00 |
| $20 | $3.00 |
| $30 | $4.00 |
| $40 | $5.00 |
| $50 | $5.00 |
| $80 | $6.00 |
| $100 | $7.00 |
| $200 | $7.00 |

42.     The actual cost to provide customers with instant access to funds is less than $0.05.[18]

43.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

44.     FMC's website, app, and marketing advertise instant or same-day access to "fast cash" Floats. For example, FMC tells customers they can receive cash "instantly," "now," and "within minutes." FMC tells consumers its cash advances are fast enough to be used in "unexpected emergencies."

45.     FMC intentionally advertises its Float product to consumers with limited and poor credit and people living paycheck to paycheck. Indeed, many of its

---

[18] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

advertisements encourage consumers to loan small amounts (less than $50.00) to pay for living or emergency expenses.

46.     In its advertisements for fast cash, FMC does not include information about the Instant Float fees users must pay to receive their loan funds instantly. Instead, users who respond to FMC's advertising and download the FloatMe app are not presented with meaningful, prominent disclosures of the Instant Float fees until they have already connected their bank account, signed up for a monthly subscription service, and begun the process of requesting a cash advance.

47.     These fees were criticized in a recent regulatory enforcement action the Federal Trade Commission ("FTC") brought against FMC.[19] Based upon an investigation, the FTC alleged, "despite its promise to make cash available 'instantly' for only the cost of a subscription, consumers cannot receive money 'instantly' unless they pay a surprise fee."[20]

48.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, consumers who do not pay the fee have to wait up to three business days to receive the "free" funds that FMC promises "instantly," "now," and "within minutes."

49.     This delay is problematic for FMC's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait. FMC's co-founder, Josh Sanchez, conceded

---

[19] *Fed. Trade Comm'n v. FloatMe Corp.*, No. 5:24-cv-0001, Compl., ECF No. 1 (W.D. Tex. Jan. 2, 2024) (hereafter "FTC Compl.").
[20] *Id.* ¶ 4.

this dynamic in an interview, noting: "What we've seen is, um, [t]here's almost
*imminent need* for the money *instantly*."[21]

50.     Indeed, a recent study found that the average loan term for FMC's
Float loan product was only 9.0 days.[22] Consumers who cannot wait nine days to
access their wages certainly will pay whatever fees an EWA provider charges to
obtain their funds as quickly as possible. As a result, the vast majority of EWA users
pay expedite fees to obtain immediate funds disbursement.[23]

51.     Turning to the second type of fee, **subscription charges** are monthly
fees FMC charges its users to apply for Cash Advances.

52.     FMC forces users signing up to its service through its app to agree to
pay a monthly $4.99 subscription fee[24] to apply for Floats.

53.     Subscription fees are presented to users as mandatory fees that must be
paid to use the platform and access FMC Floats. There is no mechanism available
through FMC's app to sign up for Floats without agreeing to the monthly
subscription charges.

54.     The FTC criticized the subscription fees as well, alleging that many

---

[21] *Josh Sanchez, FloatMe*, THE MID-POINT PODCAST, at 05:20 (July 10, 2023), available at
https://open.spotify.com/episode/1nwpJn66to54o6B5HdFPwJ.
[22] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs
of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE
LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").
[23] One recent survey found 79% of EWA users typically paid expedite fees to receive
funds faster. *Not Free*, *supra* note 21, at 3. Likewise, the Consumer Financial
Protection Bureau found 96% of fees paid by consumers using employer-integrated
EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data
Spotlight: Developments in the Paycheck Advance Market (July 18, 2024),
https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-
developments-in-the-paycheck-advance-market/.
[24] The amount of the subscription fee has increased over time.

consumers were "charged subscription fees *even though* they were unable to get any cash advances at all."[25] This despite FMC's prominent advertisements that consumers can instantly receive up to $50 for just the cost of a subscription.

55.     Additionally, FMC has made cancelling its subscriptions difficult, and for certain consumers, impossible.

56.     When FMC's app was first launched, there was no cancellation mechanism in the app or on its website. Instead, subscribers had to email support to cancel. Those who tried to cancel faced substantial, unexplained delays or errors in processing before the cancellation was honored, all while they continued to be charged subscription fees.

57.     Making it difficult for customers to quit is part of FMC's growth strategy. In internal communications about cancellation methods, FMC's executives noted the company had "maintained strong user retention by only allowing cancellation via support tickets."

58.     In 2020, FMC created two purportedly automated cancellation paths. Behind the scenes, FMC executives overseeing the project explicitly instructed the new methods should continue to "make[] it difficult for someone to quit" and still "feature some friction."[26]

59.     Even after these semi-automated processes were developed, FMC refused (and refuses) to allow users to cancel their subscription if the user has not

---

[25] FTC Compl., ¶ 17.
[26] For instance, users who try to cancel through a customer support agent are often sent a prewritten script asking the customer to describe their problems with the app. FMC internally characterizes this script as the "Cancel Prevention macro."

repaid all their cash advances.

60.    When properly viewing EWA products' expedite fees and subscription fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

61.    A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



62.    The APR received by FMC for its Float product is generally ***much higher***. A recent study of thousands of FMC cash advances revealed an average APR of ***956%***.[27]

63.    Ironically, FMC and other industry participants market their products as a low-cost alternative to payday loans.[28] FMC promotes its product as preferable

---

[27] *Not Free*, *supra* 21, at 10.
[28] *How is a Float different from a traditional loan?*, FLOATME (stating "we [FMC] don't charge interest like a traditional loan[.] . . ."), https://floatme.zendesk.com/hc/en-us/articles/360036578313-How-is-a-Float-different-from-a-traditional-loan.

to, and more consumer friendly than, other short-term lending options.[29]

64.    In truth, FMC is a wolf in sheep's clothing: extending loans with APRs far *exceeding* the exorbitantly-priced payday loan products it claims to replace.

65.    The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[30] For FMC, fees are impossible to avoid, since users have to pay *at least* a monthly subscription to be eligible to apply for a Float cash advance and FMC makes more money on Instant Float fees than on the vast majority of loans extended to its customers.

66.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and creates an ever-increasing reliance on emergency funds from—and the fees that come with—

---

[29] Though FMC pretends its product is something other than a loan to avoid regulation, its team and funders have conceded the reality that "Floats" are loans. *See* Hoffman, *Why we invested in FloatMe, an app covering cash gaps and improving financial lives*, SAMSUNG NEXT (Jan. 28, 2025) ("A 'float' *or loan* from FloatMe is designed as a short-term way to access cash. Users, who pay a small monthly membership fee, can borrow up to $50 a month interest-free[.]"), https://www.samsungnext.com/blog/why-we-invested-in-floatme-an-app-for-fast-and-inexpensive-cash-advances. Even FMC's founder has stated that Floats are tantamount to loans. *From Shady Payday Loans to "Floats" − Escape Negative Debt Cycles with Josh Sanchez, CEO & Co-Founder of FloatMe.io*, CARE MORE BE BETTER, transcript available at https://caremorebebetter.com/from-shady-payday-loans-to-floats-escape-negative-debt-cycles-with-josh-sanchez-ceo-co-founder-of-floatme-io. (Josh Sanchez, founder of FMC: "[I]t's awesome to see actually Members calling advances or loans and replacing them with the word float."); *id.* (Sanchez noting FMC is trying to solve "bigger pain points" for its users and considering "how can we [FMC] provide a loan, in this case, that is a much larger loan [than the Float loans capped at $50]").
[30] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024).

EWA loans.

67.    A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[31] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

68.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[32]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

69.    While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

70.    Not everyone who creates a FMC account and pays subscription fees will qualify for a cash advance. To be eligible for a Float, borrowers must meet

---

[31] *Id.*
[32] *Not Free*, *supra* note 21, at 6.

minimum qualifications set by FMC.

71.    To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, FMC requires users to connect their accounts to FMC through a third-party service called Plaid.[33] Plaid partners with FMC and other fintech companies to allow them to view data in customers' accounts. Plaid allows FMC to "[q]uickly verify assets and income" of FMC users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[34]

72.    FMC uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits on the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available.

73.    FMC's underwriting process is detailed and considers many factors. FMC continually adjusts eligibility and maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, FMC "uses a wide range of data points to qualify your account for Floats." According to FMC, its "system helps us analyze your specific situation to reduce the risk of an overdraft fee or a defaulted Float."

74.    In addition, FMC represents to users that it considers the following

---

[33] Users signing up for a FMC account through the app are shown a screen directing the user to link their bank account.
[34] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).

factors when determining eligibility, reproduced verbatim:

- **Make sure your FloatMe account is in good standing.** That is, you've paid your subscription fees, your Floats have all been paid back, etc.

- **Is your checking account also in good standing?** Do you normally maintain a positive bank balance? Do you have regular transactions in this account?

- **Do you have recurring income in your bank account?** Our system requires a minimum of 2 consecutive deposits from an eligible source.

- **Is your linked debit card valid?** We'll need a valid debit card in order to send you Instant Floats.

- **Spending patterns on payday or the day after.** Do you normally withdraw or transfer large amounts of money on payday or the day after? We understand large expenses happen, check out our blog for tips on how to plan ahead.

75.     In addition to these factors, elsewhere on its website, FMC advises that

users can increase the amount they can borrow based on factors including:

- **Money Management**

  o   Consistently maintaining a positive bank balance

  o   Spending less money than you make (and having funds left over each payday)

- **Float Repayment**

  o   Positive repayment history on your Floats is key towards increasing your Float limit

- **Income**

  o   Higher-income levels

  o   Longer employer deposit history

  o   Consistent income amounts (aka low-income volatility)

76.     In addition, FMC automatically refuses to extend a cash advance to

any user whose "bank balance falls below a certain amount." Moreover, FMC

refuses to extend loans to users who are self-employed, independent contractors, gig

workers, or who receive income from public assistance.

77.    FMC's underwriting process is both rigorous and continual. FMC uses algorithms and automated processes to determine customer eligibility (for any cash advance, and to set limits) on an ongoing basis, and advises customers who are deemed ineligible to "wait a few hours and try again."

78.    Qualifying for a cash advance is by no means guaranteed. FMC notes that its Float cash advances are not available when its "system" determines the borrower poses a "risk of [] a defaulted Float." During the class period, tens of thousands of users who created a FMC account, provided all the information (including sensitive demographic information and bank account access) requested, *and* signed up to pay and paid subscription fees were deemed by FMC unqualified for a cash advance.

79.    That is, after reviewing borrowers' financials, FMC determines many of its paying customers are not credit worthy and declines to offer them Float access.

80.    For borrowers who qualify, FMC strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay. Through its constant underwriting process, FMC extends loans to borrowers only when it is confident they will repay.

81.    For qualifying borrowers, FMC generally begins by offering relatively low amounts of credit: according to the FTC's investigation, first-time users are eligible for a maximum of $20.00 (not the $50.00 that is advertised).[35] While some

---

[35] FTC Compl., ¶ 30. In an interview of FloatMe's founder, Josh Sanchez, for a podcast, Mr. __ characterized FMC's underwriting process as a method for determining whether users are "credit worthy." *From Shady Payday Loans to "Floats"*

FMC raises the Float limit max for certain users who demonstrate good financial health and consistently pay back their floats on time, "*less than 5%* of consumers received a Float of more than $20" as of early 2024 and only 0.5% "received a $50 float."[36]

82.    Borrowers obtain greater access to credit—*i.e.*, FMC raises their maximum loan limit—by consistently paying off loans to FMC on time and generally improving their financial health (which FMC monitors through the borrowers' bank balance, spending behavior, repayment history, and income).

83.    These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[37]

---

— *Escape Negative Debt Cycles with Josh Sanchez, CEO & Co-Founder of FloatMe.io*, CARE MORE BE BETTER, transcript available at https://caremorebebetter.com/from-shady-payday-loans-to-floats-escape-negative-debt-cycles-with-josh-sanchez-ceo-co-founder-of-floatme-io.

[36] FTC Compl., ¶ 30.

[37] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

84.     In sum, FMC's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount sufficient to cover existing obligations *and* a FMC Float loan; (3) link the bank account to which direct deposits are received to FMC's app through Plaid; (4) authorize FMC to automatically debit the linked accounts on or around the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; (5) authorize FMC to make at least three additional repayment collection attempts if the first attempt fails; (6) be current on all prior Float loans; and (7) be current on all FMC subscription fees. Borrowers who fail to complete these steps cannot obtain cash advances.

85.     In addition to these loan qualification procedures, borrowers must link their bank account (that receives a consistent source of directly deposited income) to their FMC profile and authorize FMC to automatically debit their linked account on the repayment date for the amount of the Float and any additional Instant Float fee incurred in the transaction.

86.     FMC requires users to agree that if FNC is unable to process the repayment as a debit transaction, FMC may instead process the transaction as an ACH transfer.

87.     If the repayment is declined, returned, or otherwise fails, FMC continues to reattempt to collect payment two additional times, using bank account information gleaned through Plaid to time its reattempt at collecting repayment for when sufficient funds are in the borrower's account.

88.     During the cash advance request process, FMC requires users to agree

to the following: "You'll repay FloatMe from your debit card. If there's an issue with your debit card, you'll repay FloatMe from your bank account[.]"

89.    When a user requests a Float loan, the app automatically schedules the repayment for the borrower's next payday.

90.    The FMC app does not include a mechanism to cancel a Float loan repayment once a Float loan has been issued.

91.    In addition, the FMC app does not allow a user to delete or remove a debit card from their account (which users must authorize FMC to debit for loan repayments and subscriptions when they create an account) once they have subscribed and/or taken out a loan. Users may *replace* their debit card but may not delete it. Accordingly, FMC deprives users of a mechanism through the app for cancelling a loan repayment.

92.    Failure to pay back a FMC loan results in suspension of the borrower's account until the outstanding balance is paid.

93.    Moreover, FMC does not permit consumers with an outstanding cash advance to cancel their subscriptions through the app.[38] So, a consumer with an outstanding cash advance would continue to be charged non-cancellable subscription charges until all prior cash advances were repaid.

94.    FMC ensures repayment through the design of its app, pre-authorized debits, and subscription fees that don't cancel if a loan is outstanding. As FMC explains on its website, "we can't offer Floats without being repaid, so it's important to make your full payments on time." Further, speaking directly to its users, FMC

---

[38] FTC Compl., ¶ 56.

stresses that you (meaning the user) "agree[d] to repay your Float when you requested it, and it is our expectation that you will do so as soon as you are able."

95.    Additionally, if a borrower is unable to repay a loan, FMC prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

96.    Through these underwriting procedures and policies, FMC ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

97.    These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[39]

**FMC's Loans to Plaintiff**

98.    Plaintiff Burrison is currently an active-duty Petty Officer in the U.S. Coast Guard stationed in Boston, Massachusetts.

99.    He has been an active-duty servicemember since 2013 when he joined the U.S. Army. In March 2017, Plaintiff joined the U.S. Coast Guard. PO Burrison intends to remain on active duty until at least January 2026.

100.    FMC extended consumer credit to Plaintiff in the form of FloatMe loan transactions like those discussed above.

101.    On Plaintiff's electronic bank account statements, FMC's transactions

---

[39] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

include the FMC/FloatMe label and the description "Floatme Loan" as shown in the screenshot below:



102.    The graphic and description ("Floatme Loan") included on the electronic account statement shown above were designed and selected by FMC.

103.    PO Burrison used the loans from FMC for personal, family, or household purposes.

104.    PO Burrison paid FMC's finance charges, in the form of Instant Float fees and subscription charges, to obtain cash-advance loans from FMC.

105.    A small selection of Float loans made by FMC to Plaintiff (and accompanying Instant Float fees) are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Instant fees / subscription fee[40] / total | Loan period | APR |
|---|---|---|---|---|
| 11/1/24 – 11/5/24 | $50.00 | $5.00 / $1.99 / $6.00 | 4 days | 1,276% |
| 2/1/24 – | $20.00 | $4.00 / $3.99 / $7.99 | 14 days | 1,042% |

---

[40] Monthly membership fees were included in the calculation by dividing the monthly fee by the number of advances Plaintiff took out in the month in question. *See* 32 C.F.R.§ 232.4(c)(1)(iii)(C).

| Date | Principal Amt. | Instant fees / subscription fee[40] / total | Loan period | APR |
|---|---|---|---|---|
| 2/15/24 | | | | |
| 6/7/23 – 6/15/23 | $20.00 | $4.00 / $0.99 / $4.99 | 8 days | 1,138% |
| 5/22/23 – 6/1/23 | $20.00 | $4.00 / $1.99 / $5.99 | 10 days | 1,093% |

106.    PO Burrison has received dozens of usurious loans from FMC since he started using the service. For much of the relevant period, PO Burrison took out a loan each pay period and was forced to take out *another loan* immediately after repayment of his last loan.

107.    PO Burrison has paid monthly subscription fees throughout the relevant period to be a FMC subscriber eligible to take out FMC Float loans.

108.    The fees attendant to Defendant's loans (including, *inter alia*, Instant Float fees and subscription charges) are immediately and directly connected to FMC's extensions of credit to Plaintiff.

109.    Further, FMC's credit agreement required PO Burrison to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

110.    FMC's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

111.    FMC Violates the MLA and the TILA

112.    The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges

associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

113.   A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

114.   PO Burrison and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR §§ 232.3(g)(2) and (g)(3)).

115.   PO Burrison is a Covered Member with respect to his loan agreements with FMC because he took out the loans while an active-duty service member for personal, family or household purposes.

116.   FMC is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

117.   The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

118.   FMC violates the MLA in at least five distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any credit

disclosures required by the MLA; (3) including a Class Action Ban and Waiver of Jury Trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. See, 10 U.S.C. §§ 987(b), (c) & (e)(2), (3), (5).

119.    As a result of FMC's failure to provide substantially any of the disclosures required by TILA, FMC also violates 15 U.S.C. § 1638.

## CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this class action on behalf of himself and all other persons similarly situated and the general public. The proposed "MLA Class" and the "TILA Class" (collectively the "Classes") are defined as follows:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with FMC to use its "Float" (or substantially similar) product, in which FMC was paid a finance charge (including, without limitation, an Instant Float fee or subscription charge).

> **TILA Class**: All individuals in the United States that entered into an agreement with FMC to use its "Float" (or substantially similar) product, in which FMC was paid a finance charge (including, without limitation, an Instant Float fee or subscription charge, or tip).

121.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) FMC and any entity in which FMC has a controlling interest, or which has a controlling interest in FMC, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

122.    PO Burrison reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

## Numerosity and Ascertainability

123.    Plaintiff is unable to state the precise number of members of the classes because such information is in the exclusive control of FMC. FMC's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. FMC has made at least hundreds of thousands of loans, and PO Burrison estimates there are, at least many thousands of consumers in the MLA Class and TILA Class. As a result, Plaintiff believes that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of FMC.

124.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in FMC's possession, custody, or control.

## Commonality

125.    There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that FMC has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether PO Burrison and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

- Whether FMC is a "creditor" subject to the protections and limitations of the MLA;

- Whether FMC's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

- Whether FMC entered into standard form loan agreements with Covered Members;

- Whether FMC's loans exceed the MLA statutory rate cap of 36% MAPR;

- Whether FMC failed to provide required credit disclosures in violation of the MLA;

- Whether FMC's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

- Whether FMC's standard form loan agreements contain an arbitration clause in violation of the MLA;

- Whether FMC failed to provide required credit disclosures in violation of TILA;

- Whether each month FMC charged interest to PO Burrison and Class Members it restarted the statute of limitations under the MLA;

- Whether each month that PO Burrison and the Class Members paid money to FMC it restarted the statute of limitations under the MLA;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether FMC should be enjoined from continuing its lending practices in the manner challenged herein;

- Whether FMC is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which PO Burrison and the Class are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

## Typicality

126.    The claims and defenses of PO Burrison are typical of the claims and

defenses of the MLA Class because PO Burrison is a Covered Member and loan

agreements with FMC are typical of the type of personal, household, or family loans

that FMC normally provides to Covered Members. Additionally, FMC uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of PO Burrison are typical of the claims and defenses of the TILA Class. PO Burrison suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Classes.

**Adequate Representation**

127.    PO Burrison will fairly and adequately assert and protect the interests of the Classes. PO Burrison has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and PO Burrison has no conflict of interest that will interfere with maintenance of this class action.

128.    Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

129.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual

litigation:

- The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

130.    The proposed Classes fulfill the certification criteria of Federal Rule of Civil Procedure 23.

## FIRST CAUSE OF ACTION

**(Violations of the Miliary Lending Act, 10 U.S.C. § 987, et seq.)**
**(On Behalf of Plaintiff and the MLA Class against Defendant FMC)**

131.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–128 above.

132.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

133.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

134.    "The MAPR is the cost of the consumer credit expressed as an annual

rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

135.    PO Burrison and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

136.    PO Burrison is considered a "Covered Member" with respect to his FMC loan agreements because PO Burrison is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

137.    FMC is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

138.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

139.    FMC charged PO Burrison and the MLA Class well above the 36% interest rate cap on their loans, in violation of the MLA.

140.    FMC fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

141.    FMC's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

142.    FMC's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

143.    FMC uses a method of access to a deposit, savings, or other financial account maintained by the borrower (*i.e.*, pre-authorized debits and ACH transfers) as security for the obligation in violation of 10 U.S.C. § 987(e)(5).

144.    As a result, FMC violates 10 U.S.C. § 987.

145.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

146.    Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq*.)
### (On Behalf of Plaintiff and the TILA Class against Defendant FMC)

147.    Plaintiff re-alleges and incorporates by reference herein the allegations

set forth in the paragraphs 1–128 above.

148.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. FMC's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

149.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

150.    FMC is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

151.    FMC has not provided such disclosures before consummation of the loan agreements.

152.    FMC failed to provide such disclosures to PO Burrison and the TILA Class.

153.    As a result, FMC violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

154.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiff seeks an order from the Court awarding actual damages and statutory

damages and attorneys' fees and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Classes, Plaintiff prays for judgment against

FMC as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against FMC and in favor of Plaintiff and the Classes on all counts;

c. That the Court find and declare that that PO Burrison and MLA Class Members' standard form loan agreements violate the MLA;

d. That the Court find and declare that FMC violated the MLA and award PO Burrison and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award PO Burrison and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court find and declare that FMC violated TILA and award PO Burrison and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g. That the Court enjoin FMC from continuing to engage in predatory lending practices in violation of the MLA and TILA;

h. That FMC be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that FMC be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

i. That the Court award interest as allowable by law;

j. That the Court award reasonable attorneys' fees as provided by applicable law, including *inter alia* under the MLA, the TILA;

k. That the Court award all costs of suit; and

l. That the Court award such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of each and every cause of action so triable.

Dated: April 10, 2025

Respectfully submitted,

*/s/ John Roddy*
John Roddy (BBO # 424240)
jroddy@baileyglasser.com
BAILEY & GLASSER LLP
101 Arch Street, 8th Floor
Boston, MA 02110
617.439.6730
617.951.3954 fax

James L. Kauffman (*pro hac vice forthcoming*)
jkauffman@baileyglasser.com
BAILEY & GLASSER LLP
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
202.463.2101
202.463.2103 fax

Randall K. Pulliam (*pro hac vice forthcoming*)
rpulliam@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72207
501.312.8500

Joshua Jacobson (*pro hac vice forthcoming*)
joshua@jacobsonphillips.com
JACOBSON PHILLIPS PLLC
2277 Lee Road, Suite B
Winter Park, FL 32789
407.720.4057

*Attorneys for Plaintiff Aaron Burrison
and the Proposed Classes*