UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AARON BURRISON, individually, and on behalf of all others similarly situated, <br><br> Plaintiff <br><br> v. <br><br> FLOATME, CORP., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 25-cv-10885-DJC |

## MEMORANDUM AND ORDER

**CASPER, C.J.**                                                                                                     **February 17, 2026**

### I.   Introduction

Plaintiff Aaron Burrison ("Burrison") has filed this lawsuit as a putative class action against Defendant FloatMe, Corp. ("FloatMe"), alleging violations of the Military Lending Act ("MLA"), 10 U.S.C. § 987, and Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* D. 1. FloatMe has moved to compel arbitration and for a stay of the court proceedings pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, on the ground that the dispute is covered by an arbitration agreement. D. 12. For the reasons stated below, the Court DENIES FloatMe's motion.

### II.   Standard of Review

When ruling on a motion to compel arbitration, the Court typically looks to "the complaint and the record materials submitted in support of or opposition to the motion." Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 171 n.1 (1st Cir. 2021). "[D]istrict courts should

apply the summary judgment standard to evaluate motions to compel arbitration under the FAA." Id. at 175. Accordingly, the Court "must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Id.; Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc., 43 F.4th 150, 168 (1st Cir. 2022).

**III.     Factual Background**

The following facts are undisputed unless otherwise noted.

FloatMe operates an online platform that offers cash advances to eligible platform users. D. 13-1 at 17, 22-23.[1] FloatMe has described these advances, which it calls "Floats," as "[f]ree advances of funds to help you cover emergency expenses or to help you avoid overdrafts on your bank account." Id. at 20; see id. at 22; D. 1 ¶ 37 (alleging FloatMe markets that users can "borrow up to $50 between paydays"). A user who wishes to receive a cash advance must "link" at least one bank account the user owns at a depository institution. D. 13-1 at 20-21. A user can receive a cash advance via Automated Clearing House transfer or can pay a fee to expedite a cash advance to the user's debit card, payable when the advance is repaid. Id. at 23-24. Cash advances are repayable to FloatMe in one installment. Id. at 24. When a user accepts a cash advance, the user must confirm a repayment date and authorize FloatMe to debit the user's linked bank account on that date. Id. FloatMe will not provide a cash advance to a user if the user has not fully repaid a prior advance. Id. at 22. Still, FloatMe disclaims any "legal or contractual claim . . . based on a failure to repay a Float." Id. at 24; see id. ¶ 6.

---

[1] FloatMe filed an affidavit in support of its motion and attached, as part of the same filing, its Terms of Service and screenshots illustrating its account creation flow. D. 13-1. The Court uses "¶" to refer to a paragraph of the affidavit and otherwise cites the docket page numbers for reference to this exhibit. It is not disputed that these Terms of Service and account creation flow were in effect when Burrison created his FloatMe account, D. 13-1 ¶¶ 10-11, 14; D. 16, and neither party has suggested that a later version of the Terms of Service is relevant to the Court's analysis of FloatMe's motion.

To receive a cash advance from FloatMe, a prospective user must register an account. Id. ¶ 12. A screen displayed during the account registration process notifies the prospective user that by continuing with the process, the user agrees to the FloatMe Terms of Service. Id.; id. at 7.

The Terms of Service include an arbitration agreement (the "Arbitration Provision"). Id. at 33-38. The Arbitration Provision by its terms covers "any past, present, or future claim, dispute, or controversy involving you . . . on the one hand, and us on the other hand, relating to or arising out of [the Terms of Service], and/or the activities or relationships that involve, lead to, or result from [the Terms of Service], including . . . the validity or enforceability of this Arbitration Provision, any part thereof, or the entire [Terms of Service]." Id. at 34. A class action waiver in the Arbitration Provision provides that "no arbitration shall proceed on a class, representative, or collective basis" and specifies other limits on obtaining non-individual relief in arbitration. See id. at 36-37 (emphasis deleted). A user may opt out of the Arbitration Provision within sixty days of agreeing to the Terms of Service. Id. at 34.

Burrison signed up for a FloatMe account on December 7, 2022. Id. ¶ 8. At that time, and at least through the time he initiated this lawsuit, Burrison was an active duty servicemember with the U.S. Coast Guard. D. 1 ¶ 99. Burrison did not opt out of the Arbitration Provision. D. 13-1 ¶ 20. Burrison obtained forty-five advances from FloatMe, totaling $1,740. Id. ¶ 21.

**IV.    Procedural History**

Burrison filed this action on April 10, 2025, on behalf of himself and two proposed classes. D. 1. The proposed classes generally encompass any active duty servicemember or their dependent, or other individual in the United States, who signed up for a FloatMe account and paid money to FloatMe. Id. ¶ 120. FloatMe now has moved to compel arbitration and stay the case. D. 12. The Court heard the parties on the pending motion and took the matter under advisement. D. 29.

V.	Discussion

The "FAA compels judicial enforcement of a wide range of written arbitration agreements." Cir. City Stores, Inc. v. Adams, 532 U.S. 105, 111 (2001). The purpose of the Act is to put arbitration agreements on the "same footing as other contracts." Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-11 (1974) (quoting H.R. Rep. No. 68-96, at 1 (1924)). Accordingly, under the FAA, a "written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[T]he FAA was designed to promote arbitration," AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 345 (2011), and § 2 "embodies the national policy favoring arbitration," Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006).

A "party who is seeking to compel arbitration must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011)). Where "there is a clear and unmistakable delegation of arbitrability issues," however, the Court's inquiry is more limited. Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 28 (1st Cir. 2021) (citing Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019)). "Under this framework, a court has a somewhat straightforward task when presented with a 'delegation clause' -- an agreement to submit to arbitration those issues relating to the scope, validity, and enforceability of an arbitration agreement." Toth v. Everly Well, Inc., 118 F.4th 403, 410 (1st Cir. 2024). If there is a valid delegation agreement between the parties, "the FAA compels courts to send the entire

action to arbitration" unless the party opposing arbitration successfully challenges "the formation of the contract or the specific validity of the delegation provision." Id.

Ultimately, however, a "delegation clause is merely a specialized type of arbitration agreement, and the [FAA] 'operates on this additional arbitration agreement just as it does on any other.'" New Prime Inc. v. Oliveira, 586 U.S. 105, 112 (2019) (quoting Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 (2010)). Because this Court is authorized to compel arbitration and stay litigation only if an agreement falls within the scope of the FAA, a "necessarily antecedent statutory inquiry" for the Court is whether § 2 is implicated. See id. at 111-12; Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402 (1967).[2] Here, Burrison does not challenge the validity of the delegation clause in the traditional sense; rather, he contends that the MLA overrides the FAA and precludes enforcement of the parties' arbitration agreement against him. See generally D. 16.

### A.  Whether the MLA Displaces the FAA

"A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." Epic Sys. Corp. v. Lewis, 584 U.S. 497, 510 (2018) (quoting Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 533 (1995)). Burrison must demonstrate that Congress intended for the MLA to preclude arbitration using the text of the MLA, its legislative history or an inherent conflict between arbitration and the MLA's underlying

---

[2] For this reason, the Court rejects FloatMe's assertion that "the Court should have no issue compelling the claims to arbitration" because Burrison "failed entirely to refute that the arbitration provision is valid and covers the dispute." See D. 26 at 2; Oliveira v. New Prime, Inc., 857 F.3d 7, 14 (1st Cir. 2017) (explaining that district court's authority to act under FAA is distinct inquiry from whether parties agreed to submit dispute to arbitration), aff'd, 586 U.S. 105. Moreover, because the Court agrees that the MLA precludes arbitration in this case, the Court does not reach the question of whether the parties formed a valid delegation agreement.

purpose. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991); Prime Healthcare Servs.-Landmark LLC v. United Nurses & Allied Pros., Loc. 5067, 848 F.3d 41, 48 (1st Cir. 2017).

Here, the text of the MLA demonstrates that Congress intended to preclude enforcement of arbitration agreements against (as relevant here) servicemembers in disputes involving the extension of consumer credit. See 10 U.S.C. § 987(f)(4). "The statutory text of the MLA couldn't be clearer that where the MLA applies, the FAA does not." Steines v. Westgate Palace, L.L.C., 113 F.4th 1335, 1343 (11th Cir. 2024). Section 987(e)(3) makes it "unlawful" to extend consumer credit to a covered member or dependent if "the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute." 10 U.S.C. § 987(e)(3). Even more explicit, § 987(f)(4) provides: "Notwithstanding section 2 of [the FAA], or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member[.]" Id. § 987(f)(4); see Espin v. Citibank, N.A., 126 F.4th 1010, 1019 (4th Cir. 2025) (noting that in this provision, "Congress did indeed explicitly override agreements to arbitrate").

FloatMe contends that the plain text should not be read to preclude enforcement of arbitration agreements within the scope of the MLA, including because "[c]ourts will compel MLA claims to arbitration where the arbitration provisions contain an opt-out clause." D. 26 at 5. FloatMe is correct that in Garrett v. Monterey Financial Services, LLC, No. JKB-18-cv-325, 2018 WL 3579856 (D. Md. July 25, 2018), the court concluded that an arbitration agreement was not "require[d]" as prohibited under § 987(e)(3) because it contained an opt-out clause. Id. at *4; see D. 26 at 5-6. However, the plaintiff in Garrett did not raise, and the court did not address, the meaning of § 987(f)(4). See Garrett, 2018 WL 3579856 (No. JKB-18-cv-325), D. 10 at 6-7;

6

Garrett, 2018 WL 3579856, at *3-4. That is, even putting aside the significance of any opt-out procedure in the Arbitration Provision for not violating § 987(e)(3), Garrett does not answer the provision's enforceability under § 987(f)(4).

FloatMe further argues that § 987(f)(4) cannot be understood as a *per se* ban on arbitration because the Court must give effect to each of the MLA's provisions, and construing § 987(f)(4) as a ban would make § 987(e)(3) superfluous. D. 26 at 7-8. First, FloatMe contends that the headings of subsections 987(e) and (f) suggest that the enforcement prohibition in subsection (f) applies only to mandatory arbitration: subsection (f) is titled "Penalties and remedies," whereas subsection (e) is titled "Limitations." 10 U.S.C. § 987(e)-(f); D. 26 at 4-5, 7-9. The Court should, FloatMe urges, read the statute as follows: "[T]here are 'limitations' in the law declaring that 'required' arbitration provisions are 'unlawful' and if a limitation is violated, then the statute affords certain 'penalties and remedies,' including rendering such required arbitration provisions unenforceable." D. 26 at 5. But statutory titles and headings cannot limit the plain meaning of the text. United States v. Winczuk, 67 F.4th 11, 18-19 (1st Cir. 2023). Moreover, FloatMe does not address that paragraph (3) of subsection (f) declares that "[a]ny credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract." 10 U.S.C. § 987(f)(3). While Congress restricted the applicability of paragraph (3) to "any contract prohibited under this section," id., paragraph (4) contains no such constraint, id. § 987(f)(4). If Congress intended to limit the unenforceability of covered arbitration agreements to those declared unlawful under subsection (e), "it easily could have said so." See United States v. Abreu, 106 F.4th 1, 14 (1st Cir. 2024); Russello v. United States, 464 U.S. 16, 23 (1983) (recognizing that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the

7

disparate inclusion or exclusion" (internal citation and quotation marks omitted)).

The Court does not agree that this reading is akin to "voiding [s]ection 987(e)(3), making it entirely superfluous." See D. 26 at 8. For example, Consumer Financial Protection Bureau v. MoneyLion Technologies Inc., No. 22-cv-8308-JPC, 2025 WL 893684 (S.D.N.Y. Mar. 24, 2025), recently rejected a similar argument. See id. at *24. In an enforcement action, the Consumer Financial Protection Bureau ("CFPB") argued that because § 987(f)(4) provides that "no agreement" within its scope is enforceable, § 987(e)(3) should be read to make any such agreement unlawful, notwithstanding the identification of only "require[d]" arbitration as unlawful in § 987(e)(3). Id. at *23. The court rejected the argument that interpreting the two provisions consistent with their plain text would render one superfluous: "Section 987(e)(3) and [s]ection 987(f)(4) operate in different ways: the former makes it unlawful to include mandatory arbitration clauses in covered loan agreements and subjects a violator to civil or criminal liability, whereas the latter renders such provisions unenforceable as against the borrower." Id. at *23 n.13; see id. at *24 (explaining that "[r]egardless of what [s]ection 987(e)(3) prohibits, [s]ection 987(f)(4) independently renders all arbitration agreements unenforceable as against military borrowers"). The Court agrees that the prohibitions in the statute serve different purposes, and neither renders the other superfluous. See Revell v. Grant Money, LLC, No. 25-cv-05994-TLT, 2025 WL 3167318, at *8 (N.D. Cal. Nov. 5, 2025) (reaching same conclusion); Russell v. Dave Inc., No. 25-cv-04029-MRA-MBK, 2025 WL 3691977, at *4-5 (C.D. Cal. Dec. 12, 2025) (same), appeal docketed, No. 26-12 (9th Cir. Jan. 2, 2026).

FloatMe also urges the Court to adopt FloatMe's interpretation because it "comports with vast legislative history and secondary sources from the agencies responsible for enforcing the MLA." D. 26 at 9. First, extratextual "tools of statutory interpretation, such as legislative history,

8

customarily carry significant weight only when the text is ambiguous or its plain meaning leads to an absurd result." City of Providence v. Barr, 954 F.3d 23, 31-32 (1st Cir. 2020); see Baker v. Smith & Wesson, Inc., 40 F.4th 43, 50 (1st Cir. 2022) (rejecting legislative history arguments where statutory language was unambiguous and statutory structure reinforced plain reading of text). Second, the Court notes that the sole source of legislative history FloatMe raises is "the final rule promulgat[ed to implement] the MLA." D. 26 at 9-10. FloatMe does not explain why a regulation promulgated by an agency after the MLA's enactment is a proper source of legislative history, see id., and the case it cites does not stand for that proposition. See id. at 9 (citing Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174 (2007) (discussing notice-and-comment rulemaking requirements under Administrative Procedure Act)); cf. Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011) (explaining that "(pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law"). Finally, the Court declines to give dispositive weight to the agency report and webpages FloatMe cites, D. 26 at 10-11, if for no other reason than the statements in those sources that the MLA makes certain mandatory arbitration agreements unlawful merely reaffirm the text of the statute, and consideration of them is unnecessary to the Court's resolution of this issue. See Diaz-Valdez v. Garland, 122 F.4th 436, 448 (1st Cir. 2024).

For all of these reasons, the Court concludes that the plain text of § 987(f)(4) evinces Congress's intention to preclude the Court's enforcement of an "agreement to arbitrate any dispute involving the extension of consumer credit" against a covered member. 10 U.S.C. § 987(f)(4).

### B.    Whether the MLA Applies

The MLA's displacement of the FAA only affects the outcome here if the provision precluding arbitration applies to the present dispute between Burrison and FloatMe. See id. Burrison argues that the cash advances FloatMe provided are subject to the MLA because they

constitute consumer credit. D. 16 at 18-24. FloatMe did not address this issue, explaining that "an analysis of whether consumer credit is extended [by FloatMe] is not relevant nor dispositive to the Court's ruling on FloatMe's" motion. D. 26 at 2.

           1.     *Extension of Consumer Credit*

Burrison focuses on whether he has plausibly alleged that FloatMe's cash advances allowed him to "incur debt and defer its payment" such that they constituted consumer credit. D. 16 at 19 (quoting 32 C.F.R. § 232.3(h)). This contention, however, does not address the numerous defined terms that govern what constitutes "consumer credit" under the MLA.

Congress instructed that "consumer credit" within the meaning of the MLA would not include "a residential mortgage" or "a loan procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured." 10 U.S.C. § 987(i)(6). It otherwise directed the Secretary of Defense to promulgate regulations defining the term. Id. § 987(h)-(i). Subject to exceptions that neither party has identified as relevant, the regulations define "consumer credit" as "credit offered or extended to a covered borrower[3] primarily for personal, family, or household purposes" that is either "[s]ubject to a finance charge" or "[p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).

"Credit" is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." Id. § 232.3(h). That does not end the matter, however, as "creditor" is also a defined term: a "creditor" is a person "engaged in the business of extending

---

[3] A "covered borrower" includes, as relevant here, a covered member. See 32 C.F.R. § 232.3(g)(1). A "covered member" is a member of the armed forces serving on either active duty under a call or order that does not specify a period of thirty days or fewer, or on active Guard and Reserve duty. See id. § 232.3(g)(2). The statutory definition of "covered member" is substantially the same. 10 U.S.C. § 987(i)(1).

10

consumer credit" (or their assignee) who meets the additional criteria provided in the MLA regulations. 10 U.S.C. § 987(i)(5). The regulations generally identify a person as "[e]ngaged in the business of extending consumer credit" if the person "considered by itself and together with its affiliates meets the transaction standard for a 'creditor' under [TILA] Regulation Z with respect to extensions of consumer credit to covered borrowers." 32 C.F.R. § 232.3(i). In turn, the limitations Regulation Z applies to the definition of "creditor" include, in relevant part:

> A person regularly extends consumer credit only if it extended credit (other than [certain mortgage transactions]) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension [related to certain mortgage transactions] or one or more such credit extensions through a mortgage broker.

12 C.F.R. § 1026.2(a)(17)(v).

Taken together, then, a dispute involving the extension of consumer credit must include, at minimum: (1) "credit," which is the right granted to a consumer by a creditor to (a) defer payment of debt or (b) incur debt and defer its payment; (2) "consumer credit," meaning the "credit" is (a) offered to a covered borrower; (b) primarily for personal, family or household purposes; and (c)(i) payable by a written agreement in more than four installments or (ii) subject to a finance charge. See 10 U.S.C. § 987(i); 32 C.F.R. § 232.3(f)-(i). Finally, this is only "consumer credit" if FloatMe is (3) a "creditor," meaning a person who, with their affiliates, extended consumer credit to covered borrowers more than twenty-five times in the preceding or current calendar year.[4] See 10 U.S.C. § 987(i)(5); 12 C.F.R. § 1026.2(a)(17)(v); 32 C.F.R. § 232.3(i).

---

[4] Burrison must also qualify as a covered borrower. 32 C.F.R. § 232.3(f)(1). Because Burrison alleges that at all relevant times, he has been an active duty servicemember, D. 1 ¶¶ 98, 99, 115, the Court concludes this is satisfied. See 32 C.F.R. § 232.3(g).

11

          a)       <u>Credit</u>

As relevant here, a "credit," is the right granted to a consumer by a creditor to (1) defer payment of debt or (2) incur debt and defer its payment. 32 C.F.R. § 232.3(h). Burrison argues that FloatMe's cash advances fall under the second prong, i.e., that the advances are a right FloatMe grants a consumer to incur debt and defer its payment. <u>See</u> D. 16 at 19. Even at the time of the original MLA regulations, the Department of Defense ("DoD") specifically targeted as "credit" certain "payday loan" products that bear similarities to FloatMe's cash advances, including that such loans can involve the borrower "contemporaneously authoriz[ing] the creditor to initiate a debit or debits to the covered borrower's deposit account" when the borrower receives funds. Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 Fed. Reg. 50580, 50585-86 (Aug. 31, 2007). DoD substantially amended the MLA regulations in 2015, "primarily for the purpose of extending the protections of [the MLA] to a broader range" of credit products. Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560, 43560 (July 22, 2015); <u>see</u> <u>Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.</u>, 240 F. Supp. 3d 206, 220 (D.D.C. 2016) (explaining that in 2015 regulations, DoD "concluded that a broad definition of 'consumer credit' was necessary in order to prevent creditors from avoiding the MLA's coverage"). The amendments included generally aligning the definitions of "consumer credit" and "credit" with those in Regulation Z. <u>See</u> 80 Fed. Reg. at 43579-80, 43607.[5]

---

[5] Definitions within the MLA regulations repeatedly refer to Regulation Z, which the MLA regulations define to include "any interpretation or approval issued by an official or employee duly authorized by the [CFPB] to issue such interpretations or approvals." 32 C.F.R. § 232.3(s). The definition of "credit" in the MLA regulations, however, mirrors but does not explicitly reference the Regulation Z definition of "credit." <u>Id.</u> § 232.3(h). On December 23, 2025, after the Court's hearing on FloatMe's motion, CFPB issued an interpretive rule regarding "earned wage access" ("EWA") products. Truth in Lending (Regulation Z); Non-application to Earned Wage Access Products, 90 Fed. Reg. 60069 (Dec. 23, 2025). Therein, CFPB interpreted certain "Covered EWA"

Here, Burrison alleges that FloatMe offers cash advances to eligible users and that in return, "users must link their bank account to their . . . profile and authorize automated debits from their linked external bank account on the scheduled repayment date." D. 1 ¶¶ 37-38. He further alleges, *inter alia*, that FloatMe utilizes a "constant underwriting process" through which it "extends loans to borrowers only when it is confident they will repay," id. ¶ 80, that FloatMe prevents users with unpaid balances from obtaining additional advances, id. ¶ 95, and that FloatMe "schedule[s] debits on the payday immediately following any given loan," id. ¶ 72. This model "squarely falls within the definition of credit." Orubo v. Activehours, Inc., 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025) (interpreting TILA definition of credit as applicable where service provided cash advances "in exchange for authorization to debit a borrower's bank account immediately after their employer deposits their paycheck on payday"); see Johnson v. Activehours, Inc., No. 24-cv-02283-JRR, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025) (same); Vickery v. Empower Fin., Inc., No. 25-cv-03675-JSC, 2025 WL 2841686, at *4-5 (N.D. Cal. Oct. 7, 2025) (similar), appeal docketed, No. 25-6377 (9th Cir. Oct. 9, 2025); Moss v. Cleo AI Inc., No. C25-879-MLP, 2025 WL 2592265, at *3-4 (W.D. Wash. Sept. 8, 2025) (concluding plaintiff plausibly alleged that service advanced "credit" under MLA and TILA), appeal docketed, No. 25-5856 (9th Cir. Sept. 17, 2025).

          b)        Consumer Credit

FloatMe's cash advances are only "consumer" credit, however, if they are "offered or extended to a covered borrower primarily for personal, family, or household purposes" and

---

products as not constituting "credit" under Regulation Z. Id. at 60071-74. Neither party has brought this development to the Court's attention. Drawing reasonable inferences in Burrison's favor at this stage, to the extent CFPB's new interpretation applied under the MLA, it appears that FloatMe would not qualify as a "Covered EWA" product, at least because, as alleged, it does not use payroll data to determine accrued wages. Id. at 60071.

"[s]ubject to a finance charge" or "[p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1).

Courts construing language similar to the "personal, family, or household purposes" requirement of the MLA have understood it "as distinguishing between loans made for consumer-oriented purposes (which are covered) from loans made for business, commercial, or similar profit-seeking reasons (which are not covered)." MoneyLion, 2025 WL 893684, at *18. Here, Burrison has alleged that he "used the loans . . . for personal, family, or household purposes." See D. 1 ¶ 103. Moreover, he has also alleged that FloatMe "markets its Floats as 'Fast cash when you need it,' allowing eligible members to 'borrow up to $50 between paydays,'" id. ¶ 37, and that "many of [FloatMe's] advertisements encourage consumers to loan [sic] small amounts (less than $50.00) to pay for living or emergency expenses," id. ¶ 45. Burrison also allegedly received advances as small as twenty dollars. Id. ¶ 105. The Court is satisfied that, as alleged, he has plausibly alleged that FloatMe advanced cash to him primarily for personal, family or household purposes. See MoneyLion, 2025 WL 893684, at *18 (concluding CFPB plausibly alleged loans were issued primarily for covered purposes where marketing appealed to "personal financial goals" rather than "entrepreneurial ambitions," other perks of membership suggested "consumer-oriented financial product," loan amounts were small and many consumers paid membership fees from personal bank accounts).

Rather than payable by written agreement in more than four installments, Burrison alleges only that FloatMe's cash advances are "subject to a finance charge." See, e.g., D. 1 ¶ 2. For purposes of the MLA, "[f]inance charge has the same meaning as 'finance charge' in Regulation Z," including official interpretations thereof. 32 C.F.R. § 232.3(n), (s). Regulation Z generally defines a finance charge as "the cost of consumer credit as a dollar amount," including "any charge

14

payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). Here, Burrison alleges that he paid both subscription and expedite fees to FloatMe. See D. 1 ¶ 104. FloatMe's expedite fees "are charged to provide instant access to loan funds." See id. ¶ 41.[6] Subscription fees "are presented to users as mandatory fees that must be paid to use the platform and access" cash advances. Id. ¶ 53. As alleged, the Court concludes that at least the expedite fee plausibly represents a charge FloatMe imposed on Burrison (and other FloatMe users) "as an incident to or a condition of the extension of credit." See 12 C.F.R. § 1026.4(a); Moss, 2025 WL 2592265, at *4 (concluding EWA expedite and subscription fees were plausibly finance charges under MLA and TILA); Orubo, 780 F. Supp. 3d at 938 (concluding expedite fee EWA product imposed constituted finance charge under TILA because time of receipt of funds is material term and "payment of the lightning fee is a necessary condition to the extension of credit on the terms being offered"); Johnson, 2025 WL 2299425, at *9 (same), Vickery, 2025 WL 2841686, at *6-7 (same).[7]

### c)   Creditor

As relevant here, a "creditor" is a person who extended credit to a covered borrower more than twenty-five times in the year of or preceding a transaction. See 12 C.F.R. § 1026.2(a)(17)(v); 32 C.F.R. § 232.3(i). Burrison alleges that FloatMe is a creditor because FloatMe engages in the

---

[6] Burrison alleges that expedite fees vary, up to a maximum seven-dollar fee. Id. The Terms of Service FloatMe submitted to the Court indicate that, at least when Burrison originally signed up for a FloatMe account, an expedite fee was a flat four dollars. D. 13-1 at 24.

[7] Although CFPB's new interpretive rule advises that expedite fees are typically not "finance charges" under Regulation Z, see 90 Fed. Reg. at 60074, this interpretation did not take effect until December 23, 2025, id. at 60069. Interpretive rules typically do not raise the same retroactivity concerns as "legislative" rules. See, e.g., Fisher v. Aetna Life Ins. Co., 32 F.4th 124, 141 (2d Cir. 2022). Where the MLA regulations substantively incorporate certain agency interpretations of Regulation Z, however, see 32 C.F.R. § 232.3(s), the Court is not inclined at this stage to conclude that CFPB's interpretation applies retroactively here.

business of extending consumer credit to covered members. See D. 1 ¶ 116. Burrison separately alleges that during the relevant time period, FloatMe "extended thousands of usurious loans" to covered borrowers, id. ¶ 15, and has entered into "millions of credit transactions" with consumers, including covered borrowers, since "at least 2020," id. ¶ 11. The complaint also specifically describes four cash advances FloatMe allegedly paid Burrison in 2023 and an additional two in 2024. Id. ¶¶ 101, 105. Moreover, Burrison allegedly received a cash advance "each pay period" for "much of the relevant period." Id. ¶ 106. Accordingly, given the totality of these allegations and drawing all reasonable inferences in Burrison's favor, the Court concludes that Burrison has plausibly alleged FloatMe meets the standard for a "creditor" with respect to covered borrowers since Burrison signed up for his account.[8] See Ward v. Shad, No. 18-cv-01933-NEB, 2019 WL 1084219, at *4 (D. Minn. Mar. 7, 2019) (concluding defendants plausibly extended credit secured by a dwelling more than five times in one year based on number of real estate holdings around relevant time, number of entities involved in real estate purchases and six identified contracts for deed executed over four-year period); Taylor v. Gorilla Cap., Inc., No. 18-cv-648-MC, 2018 WL 3186946, at *5 (D. Or. June 28, 2018) (concluding defendants plausibly met at least one transaction standard where defendants allegedly regularly offered consumer credit, annually made or invested in substantial mortgage loans and sent substantial business to escrow company); cf. Mitchell v. Kurkowski, No. 22-cv-490-JRT, 2022 WL 17176888, at *4 (D. Minn. Nov. 23, 2022) (concluding plaintiff had not plausibly alleged defendants extended credit more than twenty-five times in years

---

[8] Although the Court looks to Burrison's allegations in this analysis, it notes that FloatMe's Chief Executive Officer attested that Burrison obtained forty-five advances after signing up in December 2022. D. 13-1 ¶¶ 8, 21.

16

of or preceding transactions with plaintiff where complaint alleged, at most, twenty-one total transactions over five-year period).[9]

On the present record and in light of the parties' arguments, the Court concludes that Burrison has plausibly alleged a dispute involving the extension of consumer credit within the meaning of the MLA. See 10 U.S.C. § 987(f)(4). Accordingly, because Burrison is a covered member, the dispute triggers the MLA's prohibition on the enforcement of the Arbitration Provision in the contract between Burrison and FloatMe, see id., and the Court denies FloatMe's motion to compel arbitration.

C.  **TILA Claim**

FloatMe argues that the Court should compel arbitration of Burrison's TILA claim even if it denies the motion as to Burrison's MLA claim. D. 26 at 3. Generally, if "a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation." KPMG LLP v. Cocchi, 565 U.S. 18, 19 (2011) (per curiam). Here, however, the MLA's limitation on the enforcement of arbitration agreements applies to "any dispute involving the extension of consumer credit," 10 U.S.C. § 987(f)(4), not just to claims brought under the statute. The Court concludes, therefore, that neither of Burrison's claims is arbitrable, and the Court declines to compel arbitration of Burrison's TILA claim. See Vickery, 2025 WL 2841686, at *8. Accordingly, the Court also denies FloatMe's request to stay the litigation pending the conclusion of arbitration. See D. 26 at 3-4. Although FloatMe contends that

---

[9] The courts in Ward and Mitchell analyzed in part the materially identical transaction standard for a "creditor" under 12 C.F.R. part 226. See Ward, 2019 WL 1084219, at *3; Mitchell, 2022 WL 17176888, at *4. Congress transferred TILA rulemaking authority to the CFPB effective July 21, 2011, see Truth in Lending (Regulation Z), 76 Fed. Reg. 79768, 79768 (Dec. 22, 2011), even as the Board of Governors of the Federal Reserve System retained rulemaking authority for certain motor vehicle dealers, see Truth in Lending (Regulation Z), 77 Fed. Reg. 69736, 69737 (Nov. 21, 2012).

Burrison has waived this argument, the Court does not agree that Burrison "only argues that [his] MLA claims cannot be compelled to arbitration." See id. at 3.[10] Burrison argues that the MLA prohibits arbitration of any dispute "involving [his] consumer credit transactions with" FloatMe. See D. 16 at 7; see also id. at 25 (asking Court to deny motion to compel "in its entirety").[11]

### D. Class Action Waiver

The parties dispute whether the Court should enforce the class action waiver in the FloatMe Terms of Service. D. 13 at 20-21; D. 16 at 25; D. 26 at 12-13. Assuming *arguendo* that the waiver is enforceable, it explicitly applies only to arbitration, D. 13-1 at 36-37 (stating that "[n]o arbitration shall proceed on a class, representative, or collective basis" (emphasis deleted)), as FloatMe's counsel agreed at oral argument. As such, the Court has no reason to conclude that it would prevent Burrison from pursuing his claims in this Court on a class basis. Accordingly, the Court does not reach Burrison's argument that the MLA prohibits class action waivers or that the waiver is otherwise unenforceable as it is denying the motion to compel arbitration. See D. 16 at 25.

---

[10] Likewise, the Court does not agree that Burrison just raised this argument in a notice of supplemental authority, D. 33, which FloatMe has moved to strike, D. 34. Accordingly, the Court DENIES FloatMe's motion to strike Burrison's notice of supplemental authority, D. 34. For similar reasons, the Court DENIES FloatMe's additional motions, D. 38; D. 41; D. 44, to strike Burrison's additional notices of supplemental authority, D. 37; D. 40; D. 43.

[11] At oral argument, counsel for FloatMe argued that the proposed TILA class would include individuals for whom the MLA would not preclude enforcement of the Arbitration Provision and argued that the Court should grant FloatMe's motion to compel arbitration with respect to the unnamed, non-military members of the proposed TILA class. The Court doubts its authority to do so at this juncture. See In re Checking Acct. Overdraft Litig., 780 F.3d 1031, 1037 (11th Cir. 2015). Because FloatMe's argument does not apply to Burrison, the Court will address it, if raised, at a later stage of the case, such as class certification. See Revell, 2025 WL 3167318, at *13.

## VI.   Conclusion

For the foregoing reasons, the Court DENIES FloatMe's motion to compel arbitration. D. 12.

**So Ordered.**

/s/ Denise J. Casper<br>
Chief United States District Judge